UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY BOEVE,

        Plaintiff,

vs.

Case No. 08-CV-12213
HON. GEORGE CARAM STEEH

NATIONWIDE MUTUAL INS. CO.,

        Defendant.

_____/

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AS TO PLAINTIFF'S CLAIMS
AND DEFENDANT'S COUNTERCLAIMS (# 35)

Defendant Nationwide Mutual Insurance Company moves for summary judgment on plaintiff Cindy Boeve's claims of fraud in the inducement, silent fraud, and unjust enrichment, and Nationwide's counterclaims for amounts owing under a loan. A hearing was held on February 18, 2010. For the reasons set forth below, Nationwide's motion for summary judgment will be granted.

**I. Background**

Plaintiff Cindy Boeve, an Arizona resident, executed an October 15, 2003 Independent Contractor Agent's Agreement ("ICAA") to sell insurance for defendant Nationwide. Boeve alleges Nationwide devised a fraudulent scheme to finance its marketing plans whereby independent contractors such as Boeve were induced to borrow money from non-party Nationwide Bank. Pursuant to a Capital Access Program Performance Agreement ("CAPPA"), agents such as Boeve executed Promissory Notes

and used their loan proceeds to finance new agencies.  Loans were approved based on Pro Formas and Business Plans that incorporated five-year projections.  Agents submitted the Pro Formas and Business Plans with guidance from Nationwide Business Consultants.  Loans were subject to waiver if an agent met sales goals set by Nationwide.  On August 20, 2008, the court dismissed Boeve's Michigan's Franchise Investment Law claim, and denied Nationwide's motion to dismiss her claims of fraudulent inducement, breach of contract, and unjust enrichment.  Boeve filed a First Amended Complaint on November 12, 2008 alleging fraud in the inducement in Count I and unjust enrichment in Count II, abandoning her breach of contract claim.  Nationwide filed Counterclaims on November 26, 2008 alleging Boeve owes $67,389.86 under her loan documents, and seeks equitable subrogation to the loans from Nationwide Bank.

In Count I, Boeve alleges Nationwide fraudulently induced her into entering the agreements based on the following:  Nationwide represented that it had a successful, sustainable business model for agents that was profitable to the agent when it knew the model would not be successful; Nationwide represented that the business plan and pro formas would be "mutually devised" by the parties when Nationwide devised the plan and pro formas without Boeve's input; Nationwide misrepresented that agents should expand their operations to become successful and profitable and utilized Nationwide personnel to push expansion; and Nationwide committed silent fraud by failing to disclose that Nationwide competes with the agents by selling insurance directly to customers and through Allied Insurance Company.

In Count II, Boeve alleges Nationwide was unjustly enriched as Nationwide "achieved additional storefronts, advertising, name recognition, [and] a book of business

that was formerly owned by [Boeve] . . . by virtue of the work performed by [Boeve]," and that Nationwide "did not pay Boeve for her labor and in fact made a profit from her activities[.]"

## II. Record Evidence

Boeve answered an advertisement, and became a Nationwide employee "Financed Community Agent" in 1999. Boeve executed a "Financed Community Agent Agreement" on December 27, 1999, and was assigned to work with a Nationwide agent. Boeve admittedly signed a document stating that "Company retains the right to change, alter, or amend such rules, regulations, prices, and terms, including the right to establish quotas and to limit, restrict, or discontinue entirely the acceptance or writing of any policies, coverages, lines, or kinds of insurance, at any time it deems advisable to do so, and without notice to or consent of Agent." Boeve Dep. at 26-27.

Boeve, with guidance from Nationwide Business Consultant Joe Sheffieck, developed a Business Plan which contained pro formas predicting five-year insurance demands and sales. Id. at 41. The Business Plan was used to secure her financing through Nationwide's "Capital Access Program" as a "CAP Loan." Boeve worked with Nationwide's National Sales Manager Bryan Van Epps to fill out the loan application, which included marketing information, expected results, projected rate increases, and policy retention levels. Id. at 53-55. A September 19, 2003 "Letter of Understanding" provided to Boeve regarding her CAP Loan provided that Nationwide could not "guarantee success," that the "project work" submitted was "the sole decision of" Boeve, and that "the implementation of any plan is entirely optional and solely your responsibility." Defendant's Exhibit 5. Boeve became an "Independent Contractor Agent" by signing an ICAA on

3

October 15, 2003.

Boeve's application for a $95,000.00 CAP Loan was preliminarily approved on February 11, 2004. Boeve executed a CAPPA on February 10, 2004 which stated the terms of her CAP Loan. Defendant's Exhibit 9. Boeve was to receive $65,000.00 initially, and $30,000.00 contingent upon meeting $1,549,428.00 in direct written premiums ("DWP"). Id. Boeve executed a "Credit Agreement and Promissory Note" on February 17, 2004 with Nationwide Bank. Defendant's Exhibit 10. Boeve was denied the second $30,000.00 disbursement of the $95,000.00 CAP Loan after being informed on February 22, 2005 that she was $100,000.00 short of her DWP. On February 26, 2007, Nationwide informed Boeve that she did not qualify for a waiver of her CAP Loan, and that she was required to start repayment of the loan. From 2002 through 2007, Boeve opened five Michigan offices and an Arizona office.

Boeve testified that the 1999 Nationwide advertisement spoke of "an opportunity to own your own business, unlimited income potential[.]" Boeve Dep. at 12. Before becoming an Independent Contractor Agent, Boeve was given the opportunity to talk to other agents - "some were struggling, some were doing alright," "it's not as easy as they made it sound." Id. at 13. Boeve kept pursuing her interest in becoming an Independent Contractor Agent, however, because "several . . . expressed . . . we'll still all be at that ultimate goal of owning our business, coming off their plan, and having that unlimited earnings." Id. 15. Boeve started as a Nationwide employee on December 27, 1999, and was assigned a Nationwide agent "to work with and to get some training," although Boeve denies receiving any formal training other than sales. Id. at 18-19. Prior to becoming an Independent Contractor Agent, Boeve "learned it was going to be a lot harder to go through the process, the

4

support wasn't going to be there[.]" Id. at 20. Boeve received a $35,000.00 salary as an employee. Id. at 25. Boeve understood throughout the process that Nationwide could change insurance rates, and the like, at any time, without notice. Id. at 27. Boeve testified that, notwithstanding the difficulties and mixed results she learned about from other independent contractor agents, she continued to pursue independent contractor status because Nationwide was "going to help you achieve your goals, your dreams of owning that business, having that unlimited earnings." Id. at 28. Boeve stated that, during her years as an employee, Nationwide was inconsistent, "changed their mind every day on what they wanted to sell in Michigan[.]" Id. at 29. Boeve understood "absolutely" that she would be taking more risks if she became an independent contractor, such as "[a]ll of the expenses [and] [i]f I were to grow at the rate they wanted me to grow." Id. at 31. Boeve worked with Business Consultant Sheffieck, who knew what Nationwide wanted and knew a lot about the CAP Loan Program. Id. at 41. Boeve understood there was no "written guarantee" of success. Id. at 43-44. Boeve knew that Nationwide National Sales Manager Van Epps' five-year projection that rate increases would be 6 percent per annum was "not going to be very accurate" because nobody knew the actual number over five years. Id. at 53. Boeve stated Van Epps "worked with me to establish what we thought we could produce based on higher retention levels . . . and the rate increases that they knew were coming." Id. at 54. Boeve knew, however, that the numbers were only "assumptions." Id. at 55. Boeve testified that her agency did not achieve profitability after 2004. Id. at 82. Boeve knew that her expenses increased every time she opened a new office. Id. at 83. Boeve admitted that, although she stopped being profitable after she opened her third

5

office, she continued to open three more offices because there was "potential for enough growth to become profitable again, and you would have that unlimited earnings potential, and you would qualify for more programs." Id. at 84. Boeve understood that "success was not guaranteed," but that Nationwide was "going to support our efforts in maintaining and growing our agencies and helping us keep that competitive rate so that we could continue to open up these storefronts because that was their agenda." Id. at 84. Boeve considered the even higher risk of opening her sixth office in Prescott, Arizona. Id. at 90-92. The Arizona office opened in April 2006. Id. at 92. Boeve closed all of her operations in December 2007 because she could not meet her Michigan payroll, and Nationwide would not allow her to continue operations just in Arizona. Id. Boeve testified she believes Nationwide owes her a "moral obligation" to make her whole. Id. at 102-103. Boeve's over one-year attempt at writing commercial Allied insurance in Michigan failed. Id. at 107-108.

Nationwide State Sales Director Whitehead testified he didn't know if Allied policies might be priced less than Nationwide policies. Whitehead Dep. at 41. Whitehead admitted, however, that agents were not informed "that they would be competing against another Nationwide company [Allied] . . . for the same coverages." Id. Nationwide Business Consultant Sheffieck likewise testified that Nationwide employees such as Boeve were not told before signing their ICAAs and becoming captive independent agents that a non-captive Nationwide agent could be selling competing Allied insurance across the street from a captive agent's newly opened office. Sheffieck Dep. at 84. Whitehead did not testify, as Boeve argues with citation to pages 41 and 42 of Whitehead's deposition, that Nationwide controlled the amount of premiums an agent could expect to sell, and whether or not the agent would succeed in meeting the requirements of the pro forma. See Whitehead Dep.

6

at 41-42. Nationwide Supervisor of Business Consultants Ranelle Smith testified in another lawsuit, Nemier v. Nationwide Mutual Ins. Co., 09-CV-10634 (2009), that for six captive independent agents she studied, not including Boeve, the CAP Loan was not the problem, it was the agents' expansion efforts, agreeing that Nationwide's expansion philosophy was a "disaster." Smith December 21, 2009 Dep. at 79. Sheffieck testified that the numbers in the Pro Formas were five-year projections. Sheffieck Dep. at 25. Sales Manager Van Epps testified that he was eligible to receive a bonus based on increases in direct earned premiums, but in 2004 and 2005, there was negative growth. Van Epps Dep. at 72. Sheffieck testified that he was eligible to receive a bonus based on increases in both growth and profitability, but that merely "growing into a section of customers that had poor loss ratios" would not necessarily make him eligible for a bonus. Sheffieck Dep. at 82-83. At her June 29, 2009 deposition in another lawsuit, Bye v. Nationwide Mutual Ins. Co., 08-CV-10824 (2008), Smith testified that in the past five years, growth projections were roughly two-times higher than actual growth. Smith June 19, 2009 Dep. at 15. Smith testified in Nemier, supra, that as a result of her study of six independent agents not including Boeve, she "had a tendency to believe" agents' claims that sales management had made misstatements. Smith December 21, 2009 Dep. at 117.

### III. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See

Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue" of material fact. First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000).

## IV. Fraud

### A. Fraud in the Inducement

Fraud must be proven by a plaintiff by "clear and convincing evidence." Gorman v. Soble, 120 Mich. App. 831, 840, 328 N.W.2d 119 (1982). Although fraud generally must be predicated on a past or existing fact, Hi-Way Motor Co. v. International Harvester Co., 398 Mich. 330, 336, 247 N.W.2d 813 (1976), Michigan also recognizes the claim of fraud in the inducement "where a party materially misrepresents future conduct under circumstances in which the assertions may reasonably be expected to be relied upon, and are relied upon." Custom Data Solutions, Inc. v. Preferred Capital, Inc., 274 Mich. App.

239, 242-43 (2006). The elements of fraud in the inducement are: (1) a material representation; (2) which was false; (3) that, when made, the defendant knew was false, or was made recklessly without knowledge of its truth and as a positive assertion; (4) made with intent that the plaintiff would act upon it; (5) justifiable reliance; and (6) resulting damage. Id. at 243. "Fraud in the inducement to enter a contract renders the contract voidable at the option of the defrauded party." Id. (quoting Samuel D. Begola Services, Inc. v. Wild Bros., 210 Mich. App. 636, 640, 534 N.W.2d 217 (1995)).

Construing the pleadings and evidence in a light most favorable to Boeve, Boeve has failed to come forward with clear and convincing evidence that she was induced into executing her October 15, 2003 ICAA, her February 10, 2004 CAPPA, or her February 17, 2004 Credit Agreement and Promissory Note by Nationwide's alleged fraudulent misrepresentations that: the business plan and pro forma would be mutually devised by Boeve and Nationwide consultants; Nationwide had a successful business model for captive independent agents "that was profitable to the agent and provided a livelihood to that person"; and captive independent agents should expand by adding new products, employees, and agents to increase their likelihood of developing successful, sustainable, and profitable agencies. As set forth below, Boeve failed to meet the requirements for a fraudulent inducement claim.

First, Boeve cannot sustain a claim that Nationwide misrepresented that the business plan and pro forma would be mutually devised by Boeve and Nationwide consultants. In order to maintain a claim, Boeve must show such a representation was false. To the contrary, Boeve has admitted that the business plan and pro forma were mutually created. Boeve herself prepared an initial business plan more than a year before

9

she was eligible to take out a CAP loan. Once she became eligible to receive a CAP loan, she worked with Van Epps to prepare the pro formas and loan application. Boeve testified that she agreed with the information contained in her pro forma and loan application and that such information was correct. By her failure to even mention, let alone address, this alleged misrepresentation in her response brief, Boeve implicitly concedes she does not have a fraudulent inducement claim based on such a representation. Because Boeve cannot show that Nationwide's alleged representation that the business plan and pro forma would be mutually created was false, this fraudulent inducement claim fails.

Second, Boeve cannot sustain a fraudulent inducement claim regarding Nationwide's alleged misrepresentations that it had a successful business model for captive independent agents and that captive independent agents should expand to increase their likelihood of developing successful, sustainable, and profitable agencies. Boeve has failed to show that the alleged representations were intentionally false or that they were statements of fact rather than mere opinions.

Boeve has the burden of proving that the alleged representations were intentionally false. Hi-Way Motor Co., 398 Mich. at 336. An action for fraudulent misrepresentation must be predicated on an existing fact, not upon a mere prediction of what could happen in the future. Id.; Cook v. Little Caesar Enters., Inc., 972 F. Supp. 400, 410 (E.D. Mich. 1997); see also Forge v. Smith, 458 Mich. 198, 212 (1998) (a promise or representation as to something that may happen in the future cannot form the basis of fraud). The representations alleged in this case constitute mere opinions or predictions. Even if Nationwide told Boeve that she could be successful if she followed a certain model or expanded her business, these statements are simply opinions.

While Boeve argues Nationwide intended to take advantage of her, she fails to submit any evidence that Nationwide made any knowingly false statements to her. Boeve asserts that "Nationwide knew the [pro forma] template was inappropriate and inaccurate but allowed this misrepresentation to stand," but the testimony cited by Boeve does not support this statement. Boeve cites the deposition testimony of Sheffieck, but Sheffieck testified that the numbers in the pro forma were forward-looking projections, or best guesses, of what rates and market and economic conditions may be over a five-year period. These forward-looking projections of the future are opinions, not statements of fact, and cannot constitute fraud. Boeve testified that she was told "that there was potential for enough growth to become profitable again, and you would have that unlimited earnings potential." These alleged statements only reference "potential." Indeed, Boeve acknowledged that Nationwide warned her in writing that Nationwide and its consulting group *did not guarantee her any level of success*, and implementation of the pro forma was solely in her discretion. The evidence compels a finding that the alleged Nationwide statements were only opinions of future potential, not misstatements of present fact.

Boeve relies primarily on In re Allied Supermarkets, Inc., 951 F.2d 718 (6th Cir. 1992), which affirmed the Bankruptcy Court's ruling that a wholesale grocery store supplier was liable in fraud for intentionally failing to include transportation and other incidental charges when representing to its customers that they would realize specific profits if they agreed to participate in the wholesaler's marketing plan. However, Allied Supermarkets did not involve allegations of "future promises," but fraudulent misrepresentations of calculated gross profits. "Allied told the [customers] that if they charged the suggested retail price for the goods [as calculated by Allied], they would make the profits reflected on Allied's

11

computer sheets." Id. at 724.  However, Allied did not include its charges for service, freight, and labeling as part of the "total product cost" and therefore the profits provided on the sheets were false.  Id. at 721.  Allied involved specific, intentionally false representations of fact.  In this case, Boeve has alleged nothing more than vague future promises concerning profitability and success.

Third, even if Boeve could prove a false representation, Boeve could not reasonably rely on alleged Nationwide representations that she would be profitable if she followed their program and opened more offices because she admittedly heard negative feedback during the four years she was a Nationwide employee.  Boeve worked as a Nationwide employee from December 27, 1999 until she became a captive independent agent on October 15, 2003.  During her tenure as a Nationwide employee, she learned that some captive independent agents were struggling, that it was not as easy as Nationwide made it sound, that it was going to be "a lot harder" because Nationwide's support wasn't there, that Nationwide could and did change insurance rates and the like without notice, and that Nationwide changed its mind frequently as to what they wanted to sell in Michigan.  She heard complaints from other agents about the constant changes in rates and in the program before she was even hired.  Years later, prior to taking out her loan, Boeve was frustrated with Nationwide's constant changes and with the lack of support from Nationwide.  Moreover, Boeve signed two agreements with Nationwide in which she acknowledged Nationwide's right to change "rules, regulations, prices, and terms" without providing her with notice.  With such knowledge already acquired, and such warnings already provided, Boeve could not have reasonably relied on Nationwide's alleged misrepresentations regarding profitability and success.

## B. Silent Fraud

"Silent fraud" is actionable on proof that the defendant owed a legal or equitable duty under the circumstances to disclose information, and suppressed that information. Hord v. Environmental Research Institute of Michigan, 463 Mich. 399, 412, 617 N.W.2d 543 (2000) (citing United States Fidelity and Guarantee Co. v. Black, 412 Mich. 99, 125, 313 N.W.2d 77 (1981)). A duty to disclose may arise where the plaintiff makes a specific and direct inquiry, and the defendant makes an incomplete reply as an affirmative misrepresentation which causes the plaintiff to reasonably rely on the misrepresentation. Hord, 463 Mich. at 412 (citing M&D, Inc. v. W.B. McConkey, 231 Mich. App. 22, 585 N.W.2d 33 (1998)). "The gist of the [silent fraud] action is fraudulently producing a false impression upon the mind of the other party." McConkey, 231 Mich. App. at 31 (quoting Wolfe v. A E Kusterer & Co., 269 Mich. 424, 427-428, 257 N.W. 729 (1934)) (emphasis omitted).

Boeve alleges that Nationwide owed her a duty to disclose that, in competition with Boeve, Nationwide sold insurance directly to insureds through the Internet, and sold its Allied essential insurance through independent insurance agents. Boeve asserts that Nationwide failed to disclose such information to her, leading her to believe she was "the only Nationwide game in town" when she signed her contract.

While Boeve may have subjectively believed she was the only Nationwide source in town, she has not identified evidence that Nationwide made any affirmative statement that led her to believe Nationwide was not affiliated with Allied (or any other insurance company that sold policies through distribution channels other than Nationwide's direct agents). Nationwide argues that it is common in the insurance industry for insurance

companies to have subsidiaries or affiliates that sell the same or similar insurance through different distribution channels. Nationwide also argues that it is common for an insurance company to have multiple distribution points - to sell insurance through independent agents and to sell insurance directly to consumers. Moreover, Nationwide's affiliation with Allied was public knowledge. Boeve has offered no evidence in support of her argument that Nationwide acted deceptively or suppressed its affiliation with Allied. In her response brief, Boeve also alleges that the duty to disclose arose because of an alleged pricing differential between Allied and Nationwide products, which "was for an improper purpose." However, Boeve offers no evidence to support her theory that Nationwide and Allied manipulated their prices, or did so to harm Nationwide agents. Therefore, Boeve's silent fraud claim fails.

**V. Unjust Enrichment**

As discussed in the Court's August 20, 2008 Order, Ohio law applies to Boeve's unjust enrichment claim. Ohio law precludes a party from maintaining a claim for unjust enrichment where an express contract governs the same subject matter. Aultman Hosp. Ass'n v. Community Mutual Ins. Co., 46 Ohio St.3d 51, 55, 544 N.E.2d 920 (1989).

In her unjust enrichment count, Boeve claims Nationwide benefitted from the work performed by her and did not pay her for her labor. However, Boeve and Nationwide entered into agreements which provided the terms of Boeve's compensation. The Financed Community Agent Agreement set forth Boeve's guaranteed minimum salary as an employee. Boeve admitted that she "probably" received the amounts guaranteed in the FCAA; she did not remember the total compensation received. When Boeve became an Independent Contractor Agent, she entered into an Independent Contractor Agent

14

Agreement which set forth her new compensation terms. Boeve does not dispute she was paid correctly as an Independent Contractor Agent. Indeed, Boeve altogether fails to address this fatal defect in her unjust enrichment claim. Because express agreements govern Boeve's compensation for work performed on behalf of Nationwide, Boeve's unjust enrichment claim fails.

## VI. Nationwide's Counterclaims on Boeve Loan

In its Counterclaims, Nationwide alleges Boeve owes amounts due under her loan documents, and seeks equitable subrogation to the loans from Nationwide Bank. Boeve admits that she entered into the Credit Agreement and Promissory Note with Nationwide Bank on or about December 17, 2004. She also admits that she received a $65,000 loan pursuant to the Credit Agreement and Promissory Note. She also admits that she did not meet the requirements for loan waiver, which placed her loan into repayment mode. On March 14, 2007, Nationwide informed Boeve of her repayment obligations. Boeve has admitted that she did not repay the loan. On August 28, 2008, Nationwide Bank assigned its right, title, and interest in the Credit Agreement and Promissory Note to Nationwide, and Nationwide now holds the loan and seeks to enforce it.

Boeve argues that Nationwide breached the contract before she breached the contract, and that her fraud claims allow her to avoid the contract. As discussed above, Boeve's fraud claims fail. In addition, Boeve fails to explain or support her previous breach argument. She also argues that the equities weigh in her favor, but provides no legal or evidentiary support for her argument. The Court therefore grants Nationwide summary judgment on its counterclaim for amounts due under the loan.

## VII. Conclusion

For the reasons set forth above, defendant Nationwide's motion for summary judgment is hereby granted as to plaintiff Boeve's claims of fraud in the inducement, silent fraud, and unjust enrichment, and Nationwide's counterclaim for amounts owing under a loan. Defendant shall prepare a judgment for entry by the Court.

SO ORDERED.

Dated: September 28, 2010

s/George Caram Steeh  
GEORGE CARAM STEEH  
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on September 28, 2010, by electronic and/or ordinary mail.

s/Marcia Beauchemin  
Deputy Clerk

---